# In the United States Court of Federal Claims

No. 18-111
Filed: August 19, 2025

|  |  |
|---|---|
| CHESHIRE HUNT, INC., *et al.*, | ) ) ) |
| *Plaintiffs*, | ) ) |
| v. | ) ) ) |
| THE UNITED STATES, | ) ) ) |
| *Defendant*. | ) ) ) |

*Mark F. Hearne, II*, True North Law Group, LLC, St. Louis, MO, for Plaintiffs. *Charles J. Cooper*, Cooper & Kirk, PLLC, Washington, DC, *with whom were Michael W. Kirk* and *Megan M. Wold*, *of counsel.*

*Christopher M. Chellis*, Trial Attorney, United States Department of Justice, Environment & Natural Resources Division, Natural Resources Section, for Defendant, *with whom were Daniel J. Martin*, *Michael K. Robertson*, *Young A. Kang*, Trial Attorneys, and *Todd Kim*, Assistant Attorney General, Environment and Natural Resources Division.

**OPINION AND ORDER**

**MEYERS, Judge**.

This case deals with a surprisingly uncommon occurrence—a taking of property in the middle of a series of commercial transactions conveying multiple parcels of land from one real estate developer to another. Wynnstay Hunt, Inc. owned roughly 64 acres of land in Florida that could be developed for residential use. If the Government took the rail corridor splitting that property, Wynnstay Hunt would have a claim under the Fifth Amendment for a taking that diminished the value of the entire 64 acres. Rather than develop the land itself, however, Wynnstay Hunt chose to sell this land to D.R. Horton, Inc. for it to develop. In a series of contracts, they agreed that Wynnstay Hunt would convey the land in three parcels with separate closings for each parcel. It is also not disputed that after these conveyances, D.R. Horton would have a taking claim for the diminished value of the entire 64 acres. The wrinkle here is that the taking of the rail corridor happened to fall in the middle of these transactions when D.R. Horton held fee title to one parcel and beneficial title to the other two, and Wynnstay Hunt held legal title to two parcels as trustee for D.R. Horton.

In this circumstance, does anyone have a claim that the Government took land and diminished the value of the entire 64 acres, or do Wynnstay Hunt and D.R. Horton only have

claims regarding two of the three parcels (one is not adjacent to the rail corridor)?  This question gets to the root of the difference between the parties' appraisers because in this case the whole is greater than the sum of its parts—one large development could hold more houses than two smaller developments separated by the recreational trail.

To answer this question, the court considers three unities—physical unity, unity of use, and unity of ownership.  This case turns on the unity of ownership and whether D.R. Horton's ownership of one parcel and beneficial ownership of the two others establish common ownership sufficient to allow it to recover for the diminution of the value of all three parcels together. While older cases conclude that only the same ownership (e.g., fee simple) by the same person or entity would suffice, modern cases and treatises no longer apply such a rigid framework. Instead, they focus on the economic realities, considering things like whether there is a single decisionmaker for the future of the property.  Because one party—D.R. Horton—controlled the future of all three parcels, the unity of ownership is satisfied here, and the court will consider the larger parcel (i.e., the entire 64-acre combined parcel) when determining just compensation. Thus, the court DENIES the Government's motion for partial summary judgment and GRANTS Wynnstay Hunt and D.R. Horton's cross motion for partial summary judgment.

## I.    Background

### A.    The Railroad and the A8, A9, and B9 Parcels

This court has explained the history of the land underlying the rail corridor at issue and does not repeat it here.  *See generally Cheshire Hunt, Inc. v. United States*, 158 Fed. Cl. 101 (2022).  "In 1900, much of what is now Sarasota County, Florida was owned by Bertha Palmer and her family members," including her brother, Adrian Honore.  *Id.* at 102.  Mr. Honore granted the railroad an easement across his land.  *Id.*

These cross-motions concern three parcels in Sarasota County that the Sarasota County Property Appraiser identifies as A8, A9, and B9.  The rail corridor splits A9 and B9, and A8 lies west of A9:



7/8/2024, 6:14:34 PM

1:4,514

Yellow border - A8 (0098050006)

Orange border - A9 (0098050005)

Blue border - B9 (0098111000)

Map created by the Sarasota County Property Appraiser
Created by the Sarasota County Property Appraiser

ECF No. 243-1 at Def.'s Ex. 1.[1]  Hugh Culverhouse, Sr. acquired "a large amount" of property, including A8, A9, and B9, in the 1970s.  *See* ECF No. 246 at 2.  In 2005, Mr. Culverhouse conveyed the three parcels (and other property) to Wynnstay Hunt.  ECF No. 243-1 at Def.'s Ex. 2.

---

[1] Because the parties' exhibits span multiple docket entries, the court cites the docket number, the exhibit number, and the paragraph or page number within the exhibit, where applicable.

### B.    The Sales Agreements and the Initial Closing

Rather than develop the land itself, Wynnstay Hunt chose to sell it to D.R. Horton to develop.  In 2015, Wynnstay Hunt agreed to sell D.R. Horton A8 and A9 in the "A8-A9 sales agreement."  ECF No. 243-1 at Def.'s Ex. 3.  The A8-A9 sales agreement provided that Wynnstay Hunt and D.R. Horton would close on two parcels comprising land from A8 and A9, A9/parcel 1 at an initial closing and A8/parcel 2 at a final closing.[2]  *Id.* ¶ 4.1.  At each closing, Wynnstay Hunt would "convey marketable fee simple title to" D.R. Horton and "deliver exclusive possession of" A9/parcel 1 and A8/parcel 2, respectively.  *Id.* ¶ 4.2.

The A8-A9 sales agreement required Wynnstay Hunt to maintain marketable fee simple title with no additional encumbrances other than those the agreement specifically allowed.  *Id.* ¶¶ 5.1(f)–(g), 8.5, 11.  Until the deeds were recorded, the A8-A9 sales agreement allocated the risk of loss of the two parcels to Wynnstay Hunt and gave D.R. Horton the ability to terminate the agreement if the parcels were damaged or destroyed and not restored to substantially similar condition.  *Id.* ¶ 6.9.  And the A8-A9 sales agreement granted D.R. Horton the right to specific performance to compel Wynnstay Hunt to convey the parcels.  *Id.* ¶ 9.2.

Finally, the A8-A9 sales agreement reserved with Wynnstay Hunt the right to "any award, payment or compensation . . . relating to a condemnation, taking or other disposition of the Seminal Gulf Railroad."  *Id.* ¶ 4.2.  This reservation applied "whether such disposition, condemnation or taking occurs prior to or after Closing."  *Id.* ¶ 7.  Although D.R. Horton would "not accept any award, payment or compensation," the original sales agreement gave D.R. Horton "the unilateral right to negotiate all aspects and terms pertaining to the Railroad Disposition" if "the Railroad Disposition occurs after Closing."  *Id.*

Wynnstay Hunt conveyed A9/parcel 1 to D.R. Horton on November 18, 2016.  ECF No. 243-2 at Def.'s Ex. 8.  Like the A8-A9 sales agreement, the A9/parcel 1 deed reserves Wynnstay Hunt's right to compensation from a taking action involving the railroad corridor (the "reservation clause"):

> Grantor does hereby reserve unto itself and its successors and
> assigns, the exclusive right to receive any award, payment or
> compensation from any third party relating to a condemnation,
> taking or other disposition of the Seminal Gulf Railroad, lying to

---

[2] The A8-A9 sales agreement refers to the property transferred at the initial closing as "Parcel 1" and the property transferred at the final closing as "Parcel 2."  ECF No. 243-1 at Def.'s Ex. 3 ¶ 4.1.  The parties disagree about whether the metes and bounds of parcels 1 and 2 correspond to those of A8 and A9.  ECF No. 243 at 2–7; ECF No. 246 at 4 n.4.  Given that the acreage of parcel 1 does not match the acreage of A9, and that the acreage of parcel 2 does not match A8, ECF No. 246 at 4 n.4; ECF No. 246-9, it appears parcels 1 and 2 do not correspond exactly to A9 and A8.  Because the parties agree the distinction does not make a difference to the resolution of these cross-motions, ECF No. 254 at 7:2–6; *id.* at 40:7–11, the court does not resolve this dispute.  Because the Government refers to the parcels as A9 and A8 and Plaintiffs refer to them as parcel 1 and parcel 2, the court generally refers to them as "A9/parcel 1" and "A8/parcel 2."

the East of and adjacent to the Real Property, for the purpose of
extending the existing Legacy Trail.

*Id.* at 1.  On the same date as the initial closing on A9/parcel 1, Wynnstay Hunt granted D.R.
Horton easements across A8/parcel 2.  ECF No. 243-4 at Def.'s Ex. 24.  These easements
allowed D.R. Horton access to A8/parcel 2 and the ability to "construct, install and utilize certain
utilities" and "certain drainage improvements and facilities" on A8/parcel 2 to serve the
development of A9/parcel 1.  *Id.* ¶¶ 2–5.

Wynnstay Hunt and D.R. Horton next executed the sales agreement for B9, the "B9 sales
agreement," on January 20, 2017.  ECF No. 243-2 at Def.'s Ex. 9.  Unlike the A8-A9 sales
agreement, the B9 sales agreement only provides for a single closing.  *Id.* ¶ 4.1.  Other than the
property descriptions and the single closing, the terms of the B9 sales agreement are materially
the same as the terms of the A8-A9 sales agreement.  *Compare* ECF No. 243-1 at Def.'s Ex. 3,
*with* ECF No. 243-2 at Def.'s Ex. 9.

### C.    The NITU and the Subsequent Closings

On December 5, 2017, the Surface Transportation Board ("STB") issued the Notice of
Interim Trail Use or Abandonment ("NITU") that brought about this case.  ECF No. 243-3 at
Def.'s Ex. 18; *see also Cheshire Hunt*, 158 Fed. Cl. at 103.  The railroad corridor affected by the
NITU runs between A9/parcel 1 and B9:



ECF No. 246-9 Ex. A.

Wynnstay Hunt and D.R. Horton continued to discuss the terms of their two sales agreements following the NITU.[3]  On February 22, 2018, they amended the A8-A9 sales agreement provisions governing Wynnstay Hunt's reservation of the right to compensation for the "Railroad Disposition."  ECF No. 243-2 at Def.'s Ex. 12 ¶ 2.  The amended provision gave Wynnstay Hunt the "unilateral right to negotiate all aspects and terms pertaining to the Railroad Disposition," even if "the Railroad Disposition occurs after Closing."  *Id.*

On May 22, 2018, Wynnstay Hunt conveyed A8/parcel 2 to D.R. Horton.  ECF No. 243-4 at Def.'s Ex. 20.  The A8/parcel 2 deed includes the same reservation clause as the A9/parcel 1 deed.  *Id.* at 1.

On August 3, 2018, D.R. Horton agreed to be a party to this action in an amendment to the A8-A9 sales agreement.  ECF No. 243-3 at Def.'s Ex. 13.  On the same day, Wynnstay Hunt and D.R. Horton amended the B9 sales agreement to "acknowledge and agree that [D.R. Horton] shall not be required to be a party to any litigation with respect to the Railroad Disposition and/or Railroad Condemnation Remuneration," but D.R. Horton would still "remit to [Wynnstay Hunt] any and all awards, payments, and/or compensation received by [D.R. Horton] in connection with the Railroad Disposition and/or Railroad Condemnation Renumeration."  ECF No. 243-3 at Def.'s Ex. 16 ¶ 2.  Three days later, Plaintiffs filed their second amended complaint, adding D.R. Horton as a plaintiff.  ECF No. 14.

On February 28, 2019, Wynnstay Hunt conveyed B9 to Forestar (USA) Real Estate Group Inc., as D.R. Horton's assignee.  ECF No. 243-4 at Def.'s Exs. 21–22.  The deed for B9 includes materially the same reservation clause as the A8/parcel 2 and A9/parcel 1 deeds.  ECF No. 243-4 at Def.'s Ex. 21 at 1.

## II.    Standard of Review

Under Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).  The movant has the initial burden to show that there is no genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A "genuine" dispute of material fact exists where "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a "material" fact is one "that might affect the outcome of the suit under the governing law," as opposed to "disputes that are irrelevant or unnecessary."  *Id.*

If the movant meets its initial burden, the burden shifts to the nonmovant to show a genuine dispute of a material fact.  *Id.* at 256–57.  The nonmovant can do this by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute, or that an adverse party cannot produce

---

[3] Wynnstay Hunt and D.R. Horton amended the A8-A9 sales agreement six times.  ECF No. 243-1 at Def.'s Exs. 4–5; ECF No. 243-2 at Def.'s Exs. 10–12; ECF No. 243-3 at Def.'s Ex. 13.  Because the first four amendments are not material to the cross-motions, the court addresses only the last two.

admissible evidence to support the fact." RCFC 56(c)(1). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. And while "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor[,]" *id.* at 255, the nonmovant's evidence must be "significantly probative" and more than "merely colorable" to defeat summary judgment, *id.* at 249–50. Further, "mere denials or conclusory statements are not sufficient" to defeat a summary judgment motion. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390–91 (Fed. Cir. 1987) (citing *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836 (Fed. Cir. 1984)). "The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other." *Bubble Room, Inc. v. United States*, 159 F.3d 553, 561 (Fed. Cir. 1998). Instead, "the court must evaluate each motion on its own merits" and "view the evidence in favor of the nonmoving party." *Id.*

## III. Discussion

In this rails-to-trails action, "there is no dispute that the . . . NITU took property belonging to private property owners and that the government must pay 'just compensation.'" ECF No. 246 at 6. Nor do the parties dispute that D.R. Horton and Wynnstay Hunt owned property adjacent to the railroad corridor on the date that the STB issued the NITU. *See* ECF No. 243 at 17. The parties dispute whether A8/parcel 2, A9/parcel 1, and B9 constitute a single parcel for damages purposes or three parcels.

Just compensation "means the full and perfect equivalent in money of the property taken," which is also called the "market value" of the property taken. *United States v. Miller*, 317 U.S. 369, 373–74 (1943); *see also Kirby Forest Indus. Inc. v. United States*, 467 U.S. 1, 10 (1984) ("'Just compensation[]' . . . means . . . the fair market value of the property on the date it is appropriated." (citation omitted)). The market value of the property "is what a willing buyer would pay . . . to a willing seller." *Miller*, 317 U.S. at 374.

To capture the full market value, just compensation for some taking claims include "severance damage[s]." *Id.* at 376. Severance damages arise when the taking of property that is part of a larger parcel reduces the value of the remaining parcel. *Id.* ("If only a portion of a single tract is taken the owner's compensation for that taking includes any element of value arising out of the relation of the part taken to the entire tract."); *United States v. Grizzard*, 219 U.S. 180, 183 (1911) ("Whenever there has been an actual physical taking of a part of a distinct tract of land, the compensation to be awarded includes not only the market value of that part of the tract appropriated, but the damage to the remainder resulting from that taking . . . ."); *Bauman v. Ross*, 167 U.S. 548, 574 (1897) ("[W]hen part only of a parcel of land is taken . . . , the value of that part is not the sole measure of the compensation . . . ; but the . . . injury . . . to the part not taken is also to be considered."). When the property taken "is an easement, the 'conventional' method of valuation" of severance damages "is the 'before-and-after' method, i.e., 'the difference between the value of the [parcel] before and after the Government's easement was imposed.'" *Otay Mesa Prop., L.P. v. United States*, 670 F.3d 1358, 1364 (Fed. Cir. 2012) (quoting *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 632 (1961)); *see Rasmuson v.*

*United States*, 807 F.3d 1343, 1345 (Fed. Cir. 2015) (applying the "before-and-after" method in a rails-to-trails case).

### A.    A8/parcel 2, A9/parcel 1, and B9 collectively form the larger parcel for valuation.

To determine the severance damages owed in this case, the court must first determine the affected parcel (what cases often refer to as the "larger" parcel) that was diminished by the taking. This is the crux of the cross-motions. The Government contends just compensation should be awarded separately to D.R. Horton for A9/parcel 1 and to Wynnstay Hunt for B9, and neither Plaintiff should receive damages for A8/parcel 2. ECF No. 243 at 15–20. Plaintiffs argue A8/parcel 2, A9/parcel 1, and B9 should be valued together as a single parcel for the purposes of determining just compensation. ECF No. 246 at 6–13.

### 1.    Plaintiffs alleged a taking regarding A8/parcel 2.

To begin, the Government contends neither Plaintiff should receive just compensation for A8/parcel 2 because it "was not a part of Plaintiffs' allegations" in their complaint. ECF No. 243 at 9, 15–16. Not so. "In pleading a claim for just compensation under the Fifth Amendment of the United States Constitution, a party must identify the specific property interest alleged to have been taken by the United States." RCFC 9(i). Rule 9(i), however, does not impose a heightened pleading standard. Rather, the "notice pleading standards" apply, and "a basic statement of the property interests at issue is enough [to] state a claim." *United Affiliates Corp. v. United States*, 143 Fed. Cl. 257, 263 (2019); *see also Schell & Kampeter, Inc. v. United States*, 159 Fed. Cl. 829, 832 (2022) ("RCFC 9(i) simply reflects the . . . analysis that this [c]ourt will conduct when [it] turn[s] to the merits to determine whether a compensable taking has occurred.").

The second amended complaint relies in part on the 2005 deed that granted Wynnstay Hunt title to A8, A9, and B9. ECF No. 14 at 14, ¶ 11. In fact, Plaintiffs attached this deed to their complaint as an exhibit. ECF No. 14-2 at Pls.' Ex. 16. By including the deed to all three parcels in their complaint, Plaintiffs sufficiently put the Government on notice that they were bringing claims for just compensation for all three. It is also difficult to accept the Government's argument that Plaintiffs failed to include any claim for A8/parcel 2 in the second amended complaint given that its own appraiser included the combined area of A8/parcel 2 and A9/parcel 1 in his appraisal report. *E.g.*, ECF No. 246-13 at 6, 24, 29, 44. The inclusion of both A8/parcel 2 and A9/parcel 1 in that report reflected that the Government was not only on notice that Plaintiffs' claims included A8/parcel 2, but it understood A8/parcel 2's inclusion in this action.[4] That leads the court inexorably to the conclusion that Plaintiffs adequately pleaded their claim for A8/parcel 2.

### 2.    A8/parcel 2, A9/parcel 1, and B9 form the larger parcel.

---

[4] The Government explained at argument that the parties exchanged their appraisal reports before the Government had access to all the relevant documents governing the ownership of the properties. ECF No. 254 at 56:16–57:8, 58:21–59:6, 59:9–16. That does nothing to change the fact that it was clear that Plaintiffs' claims included A8/parcel 2.

The Government next argues that Plaintiffs cannot recover for A8/parcel 2 because it is not adjacent to the railroad corridor. ECF No. 243 at 9, 15. But the fact that A8/parcel 2 is separated from the rail corridor by A9/parcel 1 does not mean that Plaintiffs cannot recover anything for its loss of value (if they can prove that loss at trial). The question is whether A8/parcel 2 is part of the larger parcel with A9/parcel 1 and B9 such that Plaintiffs can recover for its diminished value.

Before turning to what the parties dispute, the court looks first at what they agree upon. The Government does not dispute that on December 5, 2017, the date of taking, D.R. Horton owned A9/parcel 1 and Wynnstay Hunt owned B9, both of which are adjacent to the rail corridor. Nor could it. The documents in the record confirm that D.R. Horton owned parcel 1 on December 5, 2017, ECF No. 243-2 at Def.'s Ex. 8 (granting D.R. Horton title to parcel 1 in 2016), and Wynnstay Hunt owned B9 in trust for D.R. Horton on that date, ECF No. 243-1 at Def.'s Ex. 2 (granting Wynnstay Hunt title to all three parcels in 2005); ECF No. 243-2 at Def.'s Ex. 9 (B9 sales agreement dated January 20, 2017). And A9/parcel 1 and B9 are adjacent to the railroad corridor. Plaintiffs "have cleared a preliminary hurdle in pursuit of their takings claims; they owned land adjacent to the railway when the taking allegedly occurred." *Rogers v. United States*, 90 Fed. Cl. 418, 428 (2009).

To determine whether A8/parcel 2 was part of the "larger parcel" that the NITU impacted, the court looks to the standard in the 2016 version of the Interagency Land Acquisition Conference's *Uniform Appraisal Standards for Federal Land Acquisitions*, often called the "Yellow Book." *Tech. Coll. of the Low Country v. United States*, 145 Fed. Cl. 408, 428 (2019) (quoting the Yellow Book standard for determining the "larger parcel"). According to the Yellow Book, the court considers whether the parcels share three unities: (1) physical unity, (2) unity of use, and (3) unity of ownership. Yellow Book § 1.4.6 at 24 ("Elements to be considered in determining the larger parcel are contiguity (or proximity) as it bears on the highest and best use of the property, unity of ownership, and unity of highest and best use."); *see* 29A C.J.S. *Eminent Domain* § 148 (2024) ("[T]he test to determine whether a parcel to be acquired is a part of a larger tract of land, so as to entitle owners to compensation for the remainder, is that there must be unity of title, physical unity, and unity of use of the parcel taken and the parcel left.").

The court need not analyze physical unity because the Government does not contest it. And the maps included above make clear that the three parcels are contiguous but-for the rail corridor splitting A9/parcel 1 and B9.

Nor must the court analyze unity of use. Unity of use, or the highest and best use, turns on whether the potential use of the parcels is physically possible, legally permissible, financially feasible, and profitable. *Tech. Coll. of the Low Country*, 145 Fed. Cl. at 429 (citations omitted). The Government asserts Plaintiffs cannot "show the same or an integrated highest and best use among the three properties." ECF No. 243 at 17. But the Government provides no further support for this assertion. And even though Plaintiffs argued that the parcels all share a highest and best use in their cross-motion, the Government makes no mention of the issue in its reply brief. This concedes the issue. *Melwood Horticultural Training Ctr., Inc. v. United States*, 151 Fed. Cl. 297, 309–10 (2020) (collecting cases).

In any event, Plaintiffs argue that A8/parcel 2, A9/parcel 1, and B9 share the same highest and best use as a single residential development and provide their appraisal report to support their argument. ECF No. 246 at 12–13; ECF No. 246-5 at 13–14. Their appraisal report concludes that the highest and best use of the parcels is residential use as a single subdivision. ECF No. 246-5 at 13–14. According to Plaintiffs' appraiser, residential use is the highest and best use of the three parcels because the properties are contiguous (therefore, such use is "physically possible"), the parcels are zoned "primarily for residential uses" (thus making such use "legally permissible"), and the parcels' "most financially feasible or maximally productive use" based on other properties in the area and market trends would be residential use. *Id.* The Government does not point to any physical, legal, or financial obstacles to the combined residential use of the three parcels. Even though hindsight is 20/20, today there are two residential communities on the property—one on A8/parcel 2 and A9/parcel 1, and another on B9—separated by the recreational trail. Thus, the parcels share the same highest and best use.

Having resolved the first two unities, the court turns to the third—unity of ownership. In broad terms, unity of ownership requires "uniform control over the ownership and future of all property making up the larger parcel." Yellow Book § 4.3.4.2 at 113 (2016) (citations omitted). This is also reflected in treatises. For example, Eaton explains that "[u]nity of title generally requires equal legal control over the ownership and future of the lands in question." J.D. Eaton, *Real Estate Valuation in Litigation* 83 (2d ed. 1995).

In the simple case, there is unity of ownership when one party holds fee title to all the parcels comprising the larger parcel. *See, e.g.*, *W. Va. Pulp & Paper Co. v. United States*, 200 F.2d 100, 103 (4th Cir. 1952) (explaining the company owned the entire claimed larger parcel affected by the taking). On the other hand, there is a lack of unity of ownership when the party holds no property interests in some of the claimed parcels. "[T]he just compensation assured by the Fifth Amendment to an owner, a part of whose land is taken for public use, does not include the diminution in value of the remainder caused by the acquisition and use of adjoining lands of others for the same undertaking." *Campbell v. United States*, 266 U.S. 368, 372 (1924). Similarly, in *United States v. 87.30 Acres of Land*, 430 F.2d 1130, 1133 (9th Cir. 1970), the court held that the larger parcel did not include land held by the parties' sons because the parties had no property interests in their sons' land.

Unity of ownership is less straightforward when multiple parties hold interests in several parcels, which is the case here. D.R. Horton held fee simple title to A9/parcel 1 on the date the STB issued the NITU. ECF No. 243-2 at Def.'s Ex. 8. On that date, Wynnstay Hunt held title to A8/parcel 2 and B9, as it had not yet conveyed these properties to D.R. Horton. *See* ECF No. 243-1 at Def.'s Ex. 2; ECF No. 243-4 at Def.'s Exs. 20–21. If Wynnstay Hunt and D.R. Horton had not already signed the contracts to convey A8/parcel 2 and B9, the unity of ownership would not exist. But they had executed these sales agreements by the date of the NITU. ECF No. 243-1 at Def.'s Ex. 3 at 26; ECF No. 243-2 at Def.'s Ex. 9 at 26. This altered the ownership of the parcels.

Under Florida law, the execution and delivery of a real estate sales agreement grants the purchaser equitable title—also called beneficial title or beneficial ownership—to the underlying property. And the purchaser's "interest . . . includes the full value of the property to which he holds equitable title." *Yaist v. United States*, 656 F.2d 616, 623 (Ct. Cl. 1981); *see Arko Enters.,*

*Inc. v. Wood*, 185 So. 2d 734, 737 (Fla. Dist. Ct. App. 1966) (describing the purchaser's interest as "beneficial title"); *Aycock Bros. Lumber Co. v. First Nat'l Bank of Dothan*, 45 So. 501, 506 (Fla. 1907) ("[T]he [purchaser] is regarded as the real beneficial owner, even though he has not paid the purchase price."); *see also Waldorff Ins. & Bonding, Inc. v. Eglin Nat'l Bank*, 453 So. 2d 1383, 1385 (Fla. Dist. Ct. App. 1984) ("Beneficial ownership passes to the purchaser . . . ."). The seller holds "legal title as trustee, and when the terms of the contract are complied with he is bound to convey." *Aycock Bros.*, 45 So. at 506; *Ins. Co. of N. Am. v. Erickson*, 39 So. 495, 498 (Fla. 1905); *see Waldorff Ins.*, 453 So. 2d at 1385 ("[T]he seller retains mere naked legal title."). "The transfer of possession is irrelevant" to the purchaser's and seller's property interests held under a real estate sales agreement. *See J.C. Penney Co. v. Koff*, 345 So. 2d 732, 736 (Fla. Dist. Ct. App. 1977); *Erickson*, 39 So. at 498. At argument, the Government conceded that equitable title is a property interest under Florida law.[5] ECF No. 254 at 14:18–25. Consequently, when the STB issued the NITU, D.R. Horton held fee title to A9/parcel 1 and equitable title to A8/parcel 2 and B9, and Wynnstay Hunt held legal title to A8/parcel 2 and B9 as trustee for D.R. Horton.

The parties dispute whether a combination of these property interests can establish unity of ownership across the three parcels. The Government argues the three parcels do not share unity of ownership. ECF No. 243 at 15, 18–20; ECF No. 249 at 4–5. Plaintiffs contend the three parcels share unity of ownership in D.R. Horton. ECF No. 246 at 7–11; ECF No. 250 at 2–7. No binding precedent establishes what test this court should apply to evaluate unity of ownership. *Bd. of Cnty. Supervisors v. United States*, 276 F.3d 1359, 1365 n.1 (Fed. Cir. 2002) (noting that the larger parcel analysis in some jurisdictions requires all the composite properties to be "owned by the same party" but declining to decide whether to "adopt such a rule" because the parties did not ask it to); *Miller v. United States*, 620 F.2d 812, 828–29 (Ct. Cl. 1980) (declining to reach whether the "lack of unity of title" precludes severance damages because the plaintiffs were otherwise not entitled to severance damages). The court therefore considers the varying approaches in other jurisdictions for guidance.

Early cases from other jurisdictions applied a strict test for unity of ownership that required "all property comprising a single larger parcel to be owned to precisely the same extent . . . by precisely the same owner." Yellow Book § 4.3.4.2 at 113–14 (citations omitted); *see, e.g., Duggan v. State*, 242 N.W. 98, 99 (Iowa 1932) (treating a person's property held in fee simple as separate from her property held as a joint tenant with her brother); *Glendenning v. Stahley*, 91 N.E. 234, 238 (Ind. 1910) (deciding not to combine the husband's fee simple property with the property he holds as tenants by the entirety with his wife).

But as the Government acknowledges, other courts have treated multiple parcels as a single parcel "where a single individual or entity does not hold identical title to all areas in the

---

[5] The Government argued in its response and reply that D.R. Horton's equitable title is a contractual right only enforceable against Wynnstay Hunt in a court of equity. ECF No. 249 at 3, 5–6. At argument, however, the Government conceded that equitable title is a property right under Florida law. ECF No. 254 at 14:18–25. Because the Government reversed its position on the status of equitable title under Florida law, the court recognizes D.R. Horton's equitable title as a property interest.

larger parcel." ECF No. 243 at 18. Those courts follow the "modern" trend of cases applying a more flexible test where "market realities . . . should in fairness be considered," so "the unity of ownership inquiry focuses on whether a *single decision maker* has *actual legal control* of all property at issue." Yellow Book § 4.3.4.2 at 114 (citations omitted). Because of this trend, "[i]n most jurisdictions, unity of ownership does not necessarily mean that the quality of the title is identical." Eaton, *supra*, at 83. Rather, "there must be a substantial unity of ownership." *Barnes v. N.C. State Highway Comm'n*, 109 S.E.2d 219, 225 (N.C. 1959). Even so, the Government argues the modern approach does not alter the outcome here because "neither Wynnstay Hunt nor D.R. Horton was a single decision maker with actual legal control across all the A8, A9, and B9 properties on the date of the NITU," so the parcels still lack unity of ownership. ECF No. 243 at 18.

<blockquote><em>a)    Federal cases apply a flexible test for unity of ownership.</em></blockquote>

This court applied the modern test for unity of ownership in *Technical College of the Low Country*, and *Stahlberg v. United States*, 157 Fed. Cl. 202 (2021). Judge Sweeney explained that when "the quality of the title [is] not identical," "legal control over the ownership and future of the lands in question [is] required to meet the unity of [ownership] test." *Tech. Coll. of the Low Country*, 145 Fed. Cl. at 428 (quoting Interagency Land Acquisition Conference, *Uniform Appraisal Standards for Federal Land Acquisitions* 48 (2000)). Similarly, in *Stahlberg*, Judge Lettow adopted the Yellow Book's test and focused on whether a "single decision maker" had "control" of all the parcels, "even though title [was] not identical" across the parcels. 157 Fed. Cl. at 207 (quoting Yellow Book § 1.4.6 at 24, § 4.3.4.2 at 114). He further explained that, under the Yellow Book's test, "[i]n deciding whether there is a single decision maker and whether unity of ownership exists, 'fairness compels consideration of market realities.'" *Id.* (quoting Yellow Book § 4.3.4.2 at 114). After acknowledging the lack of binding law on this court and the varying tests from state law, he justified his application of the Yellow Book's test as more consistent with federal law and the "goals and purposes of just compensation" than the traditional approach. *Id.* at 207–08. The court then applied that test to determine "whether properties owned by three distinct LLCs—which each in turn are owned by the same two LLCs—have the same decision maker with actual legal control over those properties to satisfy the unity-of-ownership principle." *Id.* at 207. "[E]ach of the properties at issue would be subject to the same business judgment as the others" because "the decision-making power and 'beneficial control' over the properties are vested in the 'same operative vendors.'" *Id.* at 209 (quoting Yellow Book § 1.4.6 at 24, § 4.3.4.2 at 114). As the court concluded, the parcels shared unity of ownership. *Id.*

Like *Stahlberg*, the Ninth Circuit in *United States v. 429.59 Acres of Land*, 612 F.2d 459 (9th Cir. 1980), concluded that parcels held by three corporate entities shared unity of ownership. *429.59 Acres of Land*, 612 F.2d at 463–64. Although the parcels were owned by three corporations, the same person was the "President, Chairman of the Board, and Chief Executive Officer of the three corporations formed for the purpose of acquiring the land." *Id.* at 464. As the court concluded, "[t]he fact that land . . . is owned by different entities does not destroy the unity concept." *Id.*

In another Ninth Circuit decision, the parties could claim severance damages to the parcels served by the parties' condemned easements.[6]  *United States v. 57.09 Acres of Land*, 706 F.2d 280, 281–82 (9th Cir. 1983).  The court found unity of ownership even though one claimant held only a leasehold over one parcel served by the condemned easement.  *Id.* at 282.  As the court explained, when "the leasehold is not condemned, but its value is diminished by the taking of an easement providing access to the leased property, severance damages should similarly be available to provide fair compensation."  *Id.*

Other federal courts have similarly acknowledged that varying property interests can be combined to form a larger parcel under the unity of ownership inquiry.  *See, e.g.*, *Baetjer v. United States*, 143 F.2d 391, 394 (1st Cir. 1944) (explaining that the size of the larger parcel "does not depend upon artificial things like boundaries between tracts as established in deeds in the owner's chain of title, nor does it depend necessarily upon whether the owner acquired his land in one transaction or even at one time" (internal citation omitted)); *United States v. 14.36 Acres of Land in McMullen Cnty.*, 252 F. Supp. 2d 361, 364 (S.D. Tex. 2002) ("[T]h[e] flexible view is more consistent with the goal of just compensation for what is in all other respects a unified tract of land."); *United States v. 17.69 Acres of Land*, No. 99cv1248 DMS (JMA), slip op. at 6–7 (S.D. Cal. Aug. 30, 2004) (adopting the "flexible approach to the issue of unity of ownership").  For example, a district court found unity of ownership of a larger parcel that included a parcel held individually by a husband and a parcel held by the husband and his wife as tenants by the entirety, specifically rejecting the argument that the varying property interests in the underlying parcels prevented their collective valuation.  *United States v. 339.77 Acres of Land*, 240 F. Supp. 545, 547–49 (W.D. Ark. 1965).  Another district court found a larger parcel comprised of a parcel held by a couple and a parcel held by a corporation of which the husband was the sole shareholder because: "[T]he buyer in the marketplace could readily acquire both parcels from the same operative vendors, exercising the same business judgment in the transaction."  *14.36 Acres of Land in McMullen Cnty.*, 252 F. Supp. 2d at 363–64 (quoting Julius L. Sackman, *Nichols on Eminent Domain* § 14B.06[2] (rev. 3d ed. 2001)).  Most recently, a district court concluded parcels shared unity of ownership when a party owned all the composite parcels "in some form," including an easement over part of the larger parcel.  *United States v. 8.929 Acres of Land in Arlington Cnty.*, No. 1:20-cv-667 (LMB/JFA), 2024 WL 1376025, at *12 & n.16 (E.D. Va. Mar. 29, 2024).

---

[6] The court in *57.09 Acres of Land* distinguished *United States v. Honolulu Plantation Co.*, 182 F.2d 172 (9th Cir. 1950).  *57.09 Acres of Land*, 706 F.2d at 281.  In *Honolulu Plantation*, the Ninth Circuit denied a claim by a lessee because it "had no interest whatsoever in the land which had been condemned."  *57.09 Acres of Land*, 706 F.2d at 281 (discussing *Honolulu Plantation*, 182 F.2d at 179).  The lessee in *Honolulu Plantation* also claimed severance damages for parcels it leased.  182 F.2d at 179–80.  But because that lease explicitly reserved the right to condemnation proceeds to the lessor, the government paid the lessor just compensation.  *Id.* at 180.  As a result, the lessee had no entitlement to just compensation.  *Id.*; *see also United States v. 339.77 Acres of Land*, 240 F. Supp. 545, 547 (W.D. Ark. 1965) (describing *Honolulu Plantation* to involve a party that "held only a lease of doubtful validity on a great portion of the land and its claim was basically for 'business losses'").  At least one treatise has described the *Honolulu Plantation* court's discussion of unity of ownership as dicta.  Eaton, *supra* at 82.

Even courts that have rejected a party's claim of unity of ownership have acknowledged the flexible test. *See Se. Supply Header, LLC v. 110 Acres in Covington Cnty.*, No. 2:07-CZV-291 KS-MTP, 2008 WL 127490, at *2 (S.D. Miss. Jan. 10, 2008); *United States ex rel. Tenn. Valley Auth. v. Stewart*, 429 F. Supp. 658, 660–61 & n.2 (E.D. Tenn. 1976). The court in *Southeast Supply Header* recognized that the modern trend of cases treats unity of ownership as "more expansive" than the "traditional view" that "required identical entities and titles before separate tracts could be considered a single unit." 2008 WL 127490, at *2. There, the court found no unity of ownership over a parcel held by a son with a parcel in which he held the future interest subject to his parents' present life estate. *Id.* There was no unity of ownership because a "buyer attempting to acquire [all the parcels] would have to make separate arrangements with" the son and his parents as either "could prevent a transaction to acquire a present possessory interest in the whole." *Id.* The "disunity of interest" between the son and his parents "is precisely what the unity of [ownership] concept is established to avoid." *Id.*

Another district court concluded there was no unity of ownership over three parcels subject to varying property interests—a parcel held by one plaintiff in fee simple, a parcel owned by that plaintiff and a second plaintiff as tenants in common, and a parcel owned by the plaintiff and a third plaintiff as tenants by the entirety. *Stewart*, 429 F. Supp. at 659, 661. There, the court explained the plaintiffs sought just compensation "not for incidental losses to the tracts taken as a whole, but consistent with the separate ownership interests, for incidental losses to each tract." *Id.* But the court did not hold "common ownership must . . . be in fee simple absolute" and noted "[i]t would appear that a common owner of interests less than a fee simple in abutting properties might be able to recover depreciation." *Id.* at 660 n.2.

b)    *A8/parcel 2, A9/parcel 1, and B9 share unity of ownership.*

With these cases in mind, the court turns back to this dispute. Recall that neither D.R. Horton nor Wynnstay Hunt held fee simple title to all three parcels on the date of the taking. Rather, Plaintiffs claim unity of ownership based on D.R. Horton's fee simple title to A9/parcel 1 and equitable title to A8/parcel 2 and B9. ECF No. 246 at 7; ECF No. 250 at 2. This case is thus distinguishable from *Campbell* and *87.30 Acres of Land* because D.R. Horton did hold some property interest—equitable title and fee simple title—in all the parcels involved. Yet it is undeniably different from *Stahlberg*, *429.59 Acres of Land*, and *14.36 Acres of Land*, where all the plaintiffs held fee simple title to all the property at issue.

Yet unity of ownership does not require one party to hold fee simple title to all the parcels—one party does not have hold both all the sticks in each bundle and all the bundles. As the court illustrates above, other federal courts have combined parcels into a larger parcel (1) when the party held one parcel in fee simple and another as a tenancy by the entirety, *339.77 Acres of Land*, 240 F. Supp. at 547–49, (2) when the party's interests included an easement, *8.929 Acres of Land in Arlington Cnty.*, 2024 WL 1376025, at *12 & n.16, and (3) when the party held a leasehold interest and easement, *57.09 Acres of Land*, 706 F.2d at 282. In other words, one party needs to hold sufficient interest to control the parcels to have unity of ownership. Accordingly, D.R. Horton need not hold fee simple title to all three parcels at the time the STB issued the NITU to have unity of ownership; it just needed to control the future of the property.

14

In addition, when federal courts have considered whether to combine parcels held by multiple parties with varying property interests, the courts have considered whether the parties seek to receive one award for the larger parcel or separate awards based on their property interests. *See Stewart*, 429 F. Supp. at 661; *339.77 Acres of Land*, 240 F. Supp. at 549. When the parties sought one award for the larger parcel, the court valued the composite parcels together and stated, "[t]he question of how or when [the parties] may divide the severance damages included in the award is a matter for them and them alone." *339.77 Acres of Land*, 240 F. Supp. at 549. On the other hand, when the parties sought individual severance damages awards based on their respective property interests, a federal court refused to value the composite parcels together. *See Stewart*, 429 F. Supp. at 661. Here, Wynnstay Hunt and D.R. Horton seek a single award for diminution of the value of the larger parcel. *See generally* ECF No. 246. In that way, Wynnstay Hunt's legal title to A8/parcel 2 and B9 at the time of the NITU does not prevent a valuation of the three parcels together.

The question remains whether D.R. Horton's equitable title to A8/parcel 2 and B9 and fee simple title to A9/parcel 1 were sufficient for unity of ownership. They were. D.R. Horton's equitable title and right of specific performance gave it sufficient control over A8/parcel 2 and B9 such that A8/parcel 2, A9/parcel 1, and B9 can be combined to form the larger parcel for valuation in this case.[7]

The Supreme Court explained that just compensation "should be measured in various ways depending upon the circumstances of each case and that no general formula should be used for the purpose." *Miller*, 317 U.S. at 373–74. Rather than establish a "formula," "[c]ourts have to adopt working rules in order to do substantial justice in eminent domain proceedings." *Id.* at 375. "The constitutional requirement of just compensation derives as much content from the basic equitable principles of fairness as it does from technical concepts of property law." *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 478 (1973) (internal citation omitted) (quoting *United States v. Fuller*, 409 U.S. 488, 490 (1967)). Because of these fairness principles, "[t]he Government must pay just compensation for those interests 'probably within the scope of the project from the time the Government was committed to it.'" *Id.* at 477–78

---

[7] Several state court decisions provide more support for the conclusion that equitable title can suffice to create unity of ownership. A California court decided that two parcels shared unity of ownership when a party held title to one parcel and held equitable ownership over the other. *Cnty. of Santa Clara v. Curtner*, 54 Cal. Rptr. 257, 261 (Cal. Dist. Ct. App. 1966). The Arkansas Supreme Court treated parcels as a single parcel when the buyer and the seller had agreed to the sale of all the relevant parcels before the taking, although some of the deeds were executed after the taking. *Ark. State Highway Comm'n v. Ark. Real Est. Co.*, 471 S.W.2d 340, 342 (Ark. 1971). On the other hand, when the party bringing the claim for just compensation was the seller under the real estate sales agreement, the Supreme Court of Texas decided the seller lacked unity of ownership over the parcels subject to the sales agreement because "[e]quitable title was in the vendee" at the time of the taking. *City of Austin v. Capitol Livestock Auction Co.*, 453 S.W.2d 461, 464 (Tex. 1970). These state courts treated the purchasers under real estate sales agreements as the relevant property owners for the unity of ownership inquiry, which is consistent with the Supreme Court's command to "do substantial justice in eminent domain proceedings." *See Miller*, 317 U.S. at 375.

(quoting *Miller*, 317 U.S. at 377).  Finally, the Court has emphasized that "[t]o say that such an owner would be compensated by paying him only for the narrow strip actually appropriated, and leaving out of consideration the depreciation to the remaining land by the manner in which the part was taken, and the use to which it was put, would be a travesty upon justice." *Grizzard*, 219 U.S. at 185–86.

To "do substantial justice" in this case and account for the "market realities" at work, the court holds D.R. Horton's equitable title to A8/parcel 2 and B9 created unity of ownership with A9/parcel 1.  As Plaintiffs explain, the three parcels were "*in the process* of being transferred, pursuant to binding sales contracts, from the fee simple ownership of Wynnstay Hunt to the fee simple ownership of D.R. Horton" on December 5, 2017, the date the STB issued the NITU.  ECF No. 246 at 9; ECF No. 250 at 4.  The present unity of ownership dispute resulted merely from the fortuitous timing of the NITU.  *See* ECF No. 246 at 1, 9; ECF No. 250 at 4.  If the STB issued the NITU before March 6, 2015, Wynnstay Hunt held fee simple title to all three parcels and could have sought compensation for the taking affecting all three parcels.  *See* ECF No. 254 at 7:18–8:3.  Likewise, if the STB issued the NITU after February 28, 2019, D.R. Horton would have owned all three parcels and could have sought compensation for the taking affecting all of them.  *See id.* at 8:15–19.  This dispute only arose because the STB happened to issue the NITU in the middle of the transactions conveying property from Wynnstay Hunt to D.R. Horton.  To reduce the compensation owed to Plaintiffs due to this fortuitous timing would be anything but just.

The terms of the sales agreements likewise bolster the court's conclusion.  Wynnstay Hunt could not waste the parcels after signing the sales agreements and before the closings, ECF No. 243-1 at Def.'s Ex. 3 ¶ 11; ECF No. 243-2 at Def.'s Ex. 9 ¶ 11, nor could it create any new encumbrances on the parcels, ECF No. 243-1 at Def.'s Ex. 3 ¶¶ 5.1(f)–(g), 8.5; ECF No. 243-2 at Def.'s Ex. 9 ¶¶ 5.1(f)–(g), 8.5.  If Wynnstay Hunt defaulted on those, or other, provisions of the sales agreements, D.R. Horton could compel specific performance.  ECF No. 243-1 at Def.'s Ex. 3 ¶ 9.2; ECF No. 243-2 at Def.'s Ex. 9 ¶ 9.2.  Accordingly, Wynnstay Hunt could not attempt to alter the parcels before the closings without D.R. Horton's permission, indicating that Wynnstay Hunt lacked control over the parcels.

The Government is not helped by the fact that Wynnstay Hunt and D.R. Horton entered an easement agreement at the closing on A9/parcel 1 to grant D.R. Horton access across A8/parcel 2.  ECF No. 243-4 at Def.'s Ex. 24.  It argues this easement was only necessary because "D.R. Horton lacked that hallmark property interest, the right to exclude, on the date of the NITU."  ECF No. 249 at 5; *see also* ECF No. 243 at 19.  But D.R. Horton need not hold all the sticks in the A8/parcel 2 and B9 bundles of rights; it is enough that it held sufficient sticks to control the future of those parcels.  The Government has not identified a basis in law for its exaltation of the right to exclude others as the beginning and the end of the analysis.  Nor has the Government identified anything in the sales agreements that limits D.R. Horton's control over the disposition of the property.  In fact, the sales agreements' terms make clear that D.R. Horton, not Wynnstay Hunt, controlled the future of A8/parcel 2 and B9 after signing the sales agreements.  That is all the Yellow Book requires.  *See also* Eaton, *supra*, at 83.

True, the sales agreements' terms provided the fee simple title and possession of the parcels did not pass until the closings.  ECF No. 243-1 at Def.'s Ex. 3 ¶ 4.2; ECF No. 243-2 at

16

Def.'s Ex. 9 ¶ 4.2.  While the Government is correct that these terms reflect that D.R. Horton did not hold the fee simple title to A8/parcel 2 and B9 at the time the STB issued the NITU, they do not render D.R. Horton's equitable title interest meaningless.  As the Government conceded, equitable title is a property interest.  ECF No. 254 at 14:18–25.  D.R. Horton as the purchaser obtained equitable title to A8/parcel 2 and B9 upon signing the sales agreements, and under Florida law, its lack of possession of the parcels did not affect its property interests.  *See J.C. Penney Co.*, 345 So. 2d at 736; *Erickson*, 39 So. at 498.  The question for the court is whether such a property right is sufficient to create unity of ownership, so the fact that the full fee simple title, or possession, had not yet passed is not dispositive.

The Government also challenges unity of ownership because the sales agreements placed the risk of loss on Wynnstay Hunt until the closings.  ECF No. 243-1 at Def.'s Ex. 3 ¶ 6.9; ECF No. 243-2 at Def.'s Ex. 9 ¶ 6.9.  Again, D.R. Horton need not hold all the property rights.  Considering D.R. Horton's control over A8/parcel 2's and B9's futures, the risk of loss resting with Wynnstay Hunt at the time the STB issued the NITU is not dispositive.

The Government raises two more arguments that A8/parcel 2, A9/parcel 1, and B9 do not share unity of ownership, but neither is availing.

First, the Government argues Wynnstay Hunt's legal title should be given increased weight before this court as a court of law, and not of equity.  *See* ECF No. 249 at 3 & n.1, 5–6; ECF No. 254 at 15:10–25, 17:2–9, 60:14–20.  But this argument is based on the Government's theory that equitable title is not a property right but a contractual right that D.R. Horton could exercise against Wynnstay Hunt in state court.  The Government's concession that equitable title is, in fact, a property right under Florida law defeats this argument.

Second, to the extent the Government argues that the court should treat formal title ownership as dispositive for judicial efficiency, *see* ECF No. 254 at 60:9–10, 60:14–61:15, 62:23–63:3 (describing the Government's approach to unity of ownership as the "path of least resistance"), that justification jumps the tracks.  The court's task is to determine just compensation, not follow the easy way out.  As the court's discussion above makes clear, courts have moved away from the rigid formality the Government seeks to reimpose here, and this court sees no reason in law or common sense to decide this case based on what is easy rather than what is just.

In sum, A8/parcel 2, A9/parcel 1, and B9 share unity of ownership, so these three parcels shall be valued together as a single parcel to ensure Plaintiffs receive just compensation for their taking claims.

### 3.    The three parcels should be valued together in the "before" condition as unencumbered by the railroad easement.

Plaintiffs also move for partial summary judgment to establish that the larger parcel in this case in the "before" condition should be valued "as unencumbered by any easement."  *See* ECF No. 246 at 15.  Prior decisions from this court establish that the value of the larger parcel in the "before" condition is based on "the value of [the] plaintiff['s] land unencumbered by a railroad easement."  *See, e.g.*, *Raulerson v. United States*, 99 Fed. Cl. 9, 12 (2011); *Rogers v.*

*United States*, 101 Fed. Cl. 287, 294 (2011).  The Government does not contest that the valuation treats the parcel in the "before" condition as unencumbered by the railroad easement.  Because it is uncontroverted, the court grants Plaintiffs' motion for partial summary judgment insofar as it seeks to establish that the "before" condition of the larger parcel is unencumbered by the railroad easement.  This conclusion is narrow in scope: If any other pre-existing conditions affected the railroad corridor on the date of the NITU, the court does not now decide whether those conditions should inform the valuation of the parcel in the "before" condition.  *See Rasmuson*, 807 F.3d at 1345; *Loveridge v. United States*, 167 Fed. Cl. 44, 48–50 (2023).  Yet the railroad easement does not affect the "before" condition valuation.

### B.    The Anti-Assignment Act does not apply.

The Government also seeks to prevent the valuation of the three parcels together by invoking the Anti-Assignment Act.  ECF No. 243 at 20–24; ECF No. 249 at 7–9.  The Anti-Assignment Act generally prohibits "a transfer or assignment of any part of a claim against the" Government or "the authorization to receive payment for any part of the claim," until "after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued."  31 U.S.C. § 3727(a)–(b).  The Supreme Court has acknowledged that this Act "prohibits the voluntary assignment of a compensation claim against the Government for the taking of property."[8]  *United States v. Dow*, 357 U.S. 17, 20 (1958).  An attempted assignment of a claim "does not forfeit the claim," but "[i]t leaves the claim where it was before the purported assignment."  *Colonial Navigation Co. v. United States*, 181 F. Supp. 237, 247 (Ct. Cl. 1960).

The Government argues the terms in the sales agreements that "purport[] to 'reserve' the right to takings claims against the United States" with Wynnstay Hunt violate the Anti-Assignment Act, and any attempt to rely on those terms to bolster Plaintiffs' larger parcel argument must fail under that Act.  ECF No. 243 at 21–24.  Recall, the A8-A9 sales agreement and B9 sales agreement reserved to Wynnstay Hunt the right to any just compensation award for a taking action related to the railroad corridor.  ECF No. 243-1 at Def.'s Ex. 3 ¶¶ 4.2, 7; ECF No. 243-2 at Def.'s Ex. 9 ¶¶ 4.2, 7.  The deeds also include reservation clauses to the same effect.  ECF No. 243-2 at Def.'s Ex. 8 at 1; ECF No. 243-4 at Def.'s Ex. 20 at 1; ECF No. 243-4 at Def.'s Ex. 21 at 1.  An amendment to the B9 sales agreement even acknowledged that D.R. Horton was not "required to be a party" to any taking litigation related to the railroad corridor.  ECF No. 243-3 at Def.'s Ex. 16 ¶ 2.

But Plaintiffs contend that they did not assign any claims in this case.  ECF No. 246 at 15–17; ECF No. 250 at 7–9.  They are correct.  As the court explains above, the Government acknowledged that the equitable title that D.R. Horton held to A8/parcel 2 and B9 is a property right.  ECF No. 254 at 14:18–25.  Consequently, both D.R. Horton and Wynnstay Hunt held property rights in the parcels at issue on the date of the NITU—D.R. Horton held fee simple title to A9/parcel 1 and the equitable title to A8/parcel 2 and B9, and Wynnstay Hunt held the legal title to A8/parcel 2 and B9.  Even though the terms of the sales agreements allocated any compensation for a taking claim to Wynnstay Hunt and even did not require D.R. Horton to be a party to a taking claim, the presence of both Plaintiffs here means Wynnstay Hunt is not

---

[8] Because the parties do not argue that any statutory exceptions to the Act apply, the court does not address them.

advancing a purportedly assigned claim from D.R. Horton.  Because both Plaintiffs have property rights and both bring a unified claim here, no assignment has taken place.  *See Wall Indus., Inc. v. United States*, 10 Cl. Ct. 82, 106 (1986); *Whitney Benefits, Inc. v. United States*, 31 Fed. Cl. 116, 119 & n.1 (1994); *see also Hansen v. United States*, 65 Fed. Cl. 76, 130–31 (2005) (deciding a seller had standing to bring a taking claim and explaining a state court decision that established the seller and purchaser under a real estate sales agreement had standing based on their property rights).  Further, the presence of both Plaintiffs before the court mitigates the concerns animating the Anti-Assignment Act — the risk that the Government would have to pay twice for the same claim.  *See United States v. Shannon*, 342 U.S. 288, 292 (1952); *Hobbs v. McLean*, 117 U.S. 567, 576 (1886) (describing the purpose of a predecessor statute to 31 U.S.C. § 3727 as ensuring "the government might not be harassed by multiplying the number of persons with whom it had to deal, and might always know with whom it was dealing").  Both D.R. Horton and Wynnstay Hunt are before the court, and both will be bound by this court's final judgment.  What they do with their damages award is their concern (and potentially a concern for another court if that allocation leads to a future contract dispute between them).  *See 339.77 Acres of Land*, 240 F. Supp. at 549.

The Government fares no better arguing that Plaintiffs' unity of ownership argument improperly appears to advance one claim for both Plaintiffs as co-owners of the larger parcel.  ECF No. 249 at 7–8.  Plaintiffs refuted that characterization of their claims because their unity of ownership argument recognizes their differing property interests but rests on D.R. Horton's interests.  ECF No. 250 at 8–9.  Because the court concludes above that the parcels share unity of ownership in D.R. Horton, *see supra* Section III.A.2.b, the court rejects the Government's attempt to characterize Plaintiffs as co-owners of the parcels.  Rather, as the court concludes above, both Plaintiffs have property interests in the underlying parcels and are bringing a single claim to the court.  That is enough to dispose of the Anti-Assignment Act argument.

## IV.    Conclusion

For all these reasons, the court **DENIES** the Government's motion for partial summary judgment, ECF No. 243, and **GRANTS** Plaintiffs' cross-motion for partial summary judgment, ECF No. 246.

It is so ORDERED.

s/ Edward H. Meyers
Edward H. Meyers
Judge
